In re ATLANTIC GULF
COMMUNITIES
CORP., Debtor.

No. 01–01594.

United States Bankruptcy Court,
D. Delaware.

May 22, 2007.

John D. McLaughlin, Jr., Esquire, Wilmington, DE, for the trustee.

Matthew J. Barbaro, Esquire, Robert J. Vawter, Esquire, New York State Department of Law, Albany, NY, for the New York State Department of State.

*OPINION* [1]

MARY F. WALRATH, Bankruptcy Judge.

This matter is before the Court on the Motion of the chapter 7 Trustee of Atlantic Gulf Communities Corporation (the "Debtor") to approve the termination of an escrow account established for the protection of New York consumers and the turnover of the remaining escrow funds to the estate. The Motion is opposed by the New York State Department of State (the "Department"). For the reasons stated below, the Court will grant the Motion in part.

I. *BACKGROUND*

General Development Corporation ("GDC") was incorporated in Delaware in 1928 and began homesite and community development in Florida beginning in 1955. In order to sell subdivided land to residents of New York state, GDC was required to register the land and to deposit certain funds into an escrow account (the "Escrow"). Under the terms of the Escrow Agreement dated September 7, 1976, GDC was authorized to withdraw funds from the Escrow upon certification by a licensed engineer that water and sewer facilities had been built for the communities in which the registered homesites were located. (Exh. T–1 at ¶ 3.) [2] The Escrow was funded by GDC from a portion of the monthly payments made by the homesite buyers. Prior to 1990, GDC expended considerable funds (in excess of $245 million according to the Debtor's books and records) in constructing water and sewer facilities.

In 1990, GDC and certain of its affiliates filed a petition under chapter 11 of the Bankruptcy Code in the Bankruptcy Court for the Southern District of Florida. A plan of reorganization (the "Plan") was confirmed in that case on March 27, 1992, pursuant to which GDC was renamed the Debtor. (Exh. T–14.) During that bankruptcy case, lot purchasers were given the opportunity to trade lots in undeveloped communities for lots in developed communities which had water and sewer facilities. (Exh. T–13 at p. 72.)

Subsequent to emerging from bankruptcy, the Debtor ceased selling individual lots and instead sold its remaining property on a wholesale basis to other developers. The Debtor's utility subsidiary was dissolved, and, in several instances, eminent domain proceedings were commenced which resulted in the local government authorities acquiring the Debtor's existing water and sewer facility property, together with the obligation to provide such services to the homesites. (Exh. T–10.) All the communities' utilities are now under the control of the local authorities and the Debtor has no ability to construct water or sewer facilities in those communities. (Exh. T–9.)

On May 1, 2001, the Debtor filed a voluntary petition under chapter 11 in this District. The case was subsequently converted to chapter 7 on June 18, 2002, and Michael B. Joseph was appointed the chap-

---

**1.** This Opinion constitutes the findings of fact and conclusions of law of the Court pursuant to Rule 7052 of the Federal Rules of Bankruptcy Procedure, which is made applicable to contested matters by Rule 9014 of the Federal Rules of Bankruptcy Procedure.

**2.** The Escrow Agreement was amended several times: on May 5, 1978, to permit the Debtor to withdraw funds relating to cancelled contracts; in March, 1992, to permit distribution to lot purchasers whose contracts were rejected by the Debtor in its first bankruptcy case; and in December, 1994, to allow a distribution from the Escrow to the City of Port St. Lucie which took over the obligation of the Debtor to provide water and sewer facilities.

ter 7 trustee ("the Trustee"). The Trustee entered into an agreement (the "Liquidation Agreement") with the Debtor's secured creditors (the "Lenders"), whereby the Trustee agreed to liquidate the Debtor's remaining assets and certain of the sale proceeds were made available to pay chapter 7 administrative expenses and to fund a distribution to unsecured creditors. The Liquidation Agreement was approved by the Court on November 19, 2002. Since that time, the Trustee has liquidated substantially all the assets of the estate.

On November 23, 2005, the Trustee filed the Motion of the Chapter 7 Trustee to Approve Form of Notice and for Approval of Termination of the Escrow (the "Motion"). The Court directed the Trustee to give notice to the approximately 9,000 lot purchasers who had funds deposited into the Escrow of the Trustee's request that the Escrow be terminated and the funds turned over to the Debtor's estate for distribution to creditors. The lot purchasers were instructed to file any claim they had to the balance reflected in their individual accounts.

Approximately 350 lot purchasers objected to the Motion and/or filed a claim asserting entitlement to the escrow funds attributable to their lot. The Trustee determined that many of them were qualified for a refund from the Escrow (totaling approximately $300,000). (Exhibits T–5 & T–6.) The Trustee seeks the balance of the Escrow (approximately $8.5 million) for the estate. The Lenders support the Trustee's Motion and assert that their blanket lien on all the assets of the Debtor encompasses the Debtor's interest in the Escrow.

The remaining objection to the Motion was filed by the Department which disputes the Trustee's ability to terminate the Escrow and/or the Trustee's entitlement, if the Escrow is terminated, to the funds remaining in that account. An evidentiary hearing on this objection was held on October 3, 2006. Post-trial briefs were submitted by the parties on October 17, 2006. The matter is ripe for decision.

## II. JURISDICTION

The Court has subject matter jurisdiction over this contested matter. 28 U.S.C. § 157(b)(1). This is a core matter. 28 U.S.C. § 157(b)(2)(K), (N) & (O).

## III. DISCUSSION

### A. Standing of the Department

The Trustee argues, in his post-trial brief, that the Department does not have standing to be heard on the request for turnover of the funds in the Escrow. He states that the Department is not a signatory to the Escrow Agreement, nor an intended beneficiary of the Escrow. As a result, he argues, the Department has no right to enforce the Escrow Agreement. *See, e.g., M.E.W.N., Inc. v. Vill. of Roslyn Estates,* 78 A.D.2d 636, 432 N.Y.S.2d 115, 116 (N.Y.App.Div.1980) (concluding that where parties to contract did not intend to benefit third party, latter had no right to enforce the contract); *Flemington Nat'l Bank & Trust Co. v. Domler Leasing Corp.,* 65 A.D.2d 29, 410 N.Y.S.2d 75, 77 (N.Y.App.Div.1978) (stating that contract must have intent to benefit third party beneficiary for it to have right to enforce contract).

The Trustee notes that the intent of the Escrow Agreement is evident from the first page where it states:

WHEREAS, it is mutually understood and agreed by the parties to this Agreement that this Agreement is entered into at the direction of DEPARTMENT for the purpose of protecting the Purchasers of the above described subdivided lands in the event [THE DEBTOR]

fails to complete the construction of the improvements as hereinafter described, and to induce DEPARTMENT to register said subdivided lands . . . .

(Exh. T–7 at p. 1.)

The Trustee further argues that to the extent the Department seeks to protect the interests of the beneficiaries of the Escrow, the lot purchasers, that right is limited. For example, the Trustee asserts that the lot purchasers who already sold their lots can no longer have any interest in the Escrow. Others who participated in the exchange program no longer have any interest in the Escrow as they now own a lot which has utilities. Further, those lot purchasers who filed claims in this case in response to the Trustee's Motion will be paid their respective amounts from the Escrow. Therefore, the Trustee contends that the Department really has no one to represent.

■ The Court agrees with the Trustee to a limited extent. With respect to the lot purchasers who have filed a claim for return of their funds, the Department has no standing to be heard as they are adequately representing their own interests. With respect to the lot purchasers who have established entitlement to the funds in the Escrow, the Trustee and the Lenders agree to release of the funds to them. Though the Department does not expressly agree to this, in the past (in connection with the first bankruptcy case) it has permitted release of the Escrow funds to lot purchasers. (Exh. T–7, Amendment to Escrow Agreement dated March 18, 1992.) In this case, the evidence established that there are 346 lot purchasers in this category who are entitled to $292,140 from the Escrow. (Exhs. T–5 & T–6.) The Court

will direct distribution of those funds from the Escrow to them.

■ Further, with respect to lot purchasers who have sold their lots, the Court concludes that the Department has no standing to represent them. Those lot purchasers no longer have any interest in whether water and sewer services are being provided to that lot and therefore have no further equitable interest in the Escrow. Evidence was presented that only approximately 38% of the original lot purchasers (with funds in the Escrow of $2,392,025.16) are still the recorded owners of their lots. (Exh. L–1.) The others have apparently sold their lots. Consequently, the Court concludes that the estate is entitled to the funds to which there can be no claim by the original lot purchasers ($3,499,161.83).

In addition, there are funds in the Escrow in excess of the funds attributable to New York lot purchasers. An analysis of the bank records by the Trustee revealed that $2,495,470 was erroneously placed in that account and is attributable to other non-New York lot purchasers ($2,235,397) or represents the Debtor's funds that were erroneously put into the account ($260,-073). The Department did not dispute this evidence. Accordingly, the Court will direct the release of those funds to the Trustee for distribution to creditors in accordance with the priorities of the Bankruptcy Code.

■ Therefore, the amount in controversy in this case to which New York lot purchasers have a claim is really only $2,393,525.17.[3] The Court concludes that as to those lot purchasers, however, the Department does have standing to be

3. These figures are as of December 31, 2004, when the Trustee analyzed the accounts. To the extent interest has been earned on the funds since that time, the interest should be allocated pro rata to the respective parties to whom the Escrow is being distributed. (*See* Exh. T–7 at ¶ 13.)

heard. Though the Escrow Agreement does not make the Department a beneficiary of the Escrow, it does provide that the Department is to provide instructions regarding whether funds may be distributed to the Debtor from the Escrow. For example, the Escrow Agreement provides that the Department's consent is necessary to release funds when the Debtor certifies that a portion of the water and sewer facilities have been constructed. (*Id.* at ¶ 3.)[4] More importantly, the Escrow Agreement provides that:

> [I]f there be a default in completion of the above mentioned improvements, to the extent that will not entitle [THE DEBTOR] to withdraw such funds, [THE ESCROW AGENT] shall hold and pay said funds, pursuant to instructions to be given to [THE ESCROW AGENT] by the DEPARTMENT.

(*Id.* at ¶ 8.) Consequently, the Court concludes that the Department does have standing under the terms of the Escrow Agreement to be heard on the issue of the distribution of the remaining Escrow funds with respect to the original lot purchasers for whom the Debtor did not provide water and sewer services.

### B. *Property of the Estate*

 The Trustee argues that the funds deposited into the Escrow are property of the Debtor's estate under section 541 and that consequently he is entitled to an order directing their turnover pursuant to section 542. The Trustee notes that the funds deposited into the Escrow were originally the Debtor's property. The Trustee contends that, under New York law, the Debtor retained an interest in the Escrow.[5] In fact, the Trustee argues, legal title to the escrowed funds remained in the Debtor because " 'under New York law legal title to property placed in escrow remains with the grantor until the occurrence of the condition specified in the escrow agreement'." *Cohen v. Drexel Burnham Lambert Group, Inc. (In re Drexel Burnham Lambert Group, Inc.),* 138 B.R. 687, 710 (Bankr.S.D.N.Y.1992) (*quoting Hassett v. Blue Cross and Blue Shield of Greater New York (In re O.P.M. Leasing Servs., Inc.),* 46 B.R. 661, 667 (Bankr. S.D.N.Y.1985)). *See also Alexander v. Quality Leather Goods Corp.,* 150 Misc. 577, 269 N.Y.S. 499, 500 (N.Y.Sup.Ct.1934) (holding that party which deposited stock into escrow retained all the rights of ownership until the purchase price was paid); *Press v. Marvalan Indus., Inc.,* 422 F.Supp. 346, 349 (S.D.N.Y.1976) (noting that a party who deposits property into escrow retains a right to the property and the incidents of ownership until the escrow conditions are met); *Fisher v. New York City Dep't of Hous. Pres. and Dev. (In re Pan Am Trading Corp., S.A.),* 125 B.R. 869, 878 (Bankr.S.D.N.Y.1991) (stating that a depositor of funds in escrow "retains a right to the funds and incidents of ownership until the conditions of the escrow agreement are fulfilled").

---

4. The funds can be released, however, if the consent is not received within twenty days of the certification being provided to the Department. (Exh. T–7 at ¶ 3.)

5. The parties agree that New York law applies and that under New York law an escrow was created. (Escrow Agreement at ¶ 10.) Under New York law,

> An escrow is a written agreement that imports a legal obligation to deposit an instru-

ment or property by the promisor with a third party to be kept by the latter in the capacity of depository or escrowee until the performance of a condition or happening of an event, which then is to be delivered by escrow agent to the promisee.

*Nat'l Union Fire Ins. Co. v. Proskauer Rose Goetz & Mendelsohn,* 165 Misc.2d 539, 634 N.Y.S.2d 609, 614 (N.Y.Sup.Ct.1994).

The Trustee notes that the Debtor was also the grantee of the Escrow because it was the Debtor to whom the funds were to be paid upon completion of the water and sewer systems. Thus, he argues the Debtor's estate has both legal title and an equitable interest in the funds. Because the purpose of the Escrow has been substantially met and the Debtor is unable to do anything further to assure its completion, the Trustee argues that the funds should be returned to the estate.

The Lenders agree and further assert that they have a security interest in all the estate's assets, including the Escrow. They argue that the Department is seeking to take their property interest without just compensation which should not be permitted.

The Department argues to the contrary. It distinguishes the cases cited by the Trustee as dicta or not applying New York law. The Department further contends that in construing New York law, courts have consistently held that assets held in escrow are *not* property of a debtor's estate. *See, e.g., TTS, Inc. v. Citibank, N.A. (In re TTS)*, 158 B.R. 583, 585–87 (D.Del. 1993) (holding that while debtor retained legal and some equitable interest in funds placed in escrow, the greater equitable interest of the other grantee compelled a conclusion that the funds were not property of the estate); *Musso v. N.Y. State Higher Educ. Servs. Corp. (In re Royal Bus. Sch., Inc.)*, 157 B.R. 932, 941 (Bankr. E.D.N.Y.1993) (noting that many courts hold that an escrow account may never be property of the estate, court denied turnover request of trustee where debtor had only a contingent interest in escrow account as opposed to superior equitable interest of the grantee); *O.P.M. Leasing*, 46 B.R. at 667–68 (concluding that property held in escrow is not property of the estate because for escrow to be valid the proper-

ty must be irrevocably placed outside the grantor's control). Consequently, the Department argues, only the Debtor's contingent right to the possible return of some or all of the escrowed assets can be considered property of the estate. *See, e.g., TTS*, 158 B.R. at 587; *O.P.M. Leasing*, 46 B.R. at 667. *See also* 11 U.S.C. § 541(d).

The Trustee and Lenders similarly seek to distinguish the cases cited by the Department, noting that none of them involved the situation at bar: where the Debtor is both the grantor and grantee of the escrow. Being the grantor (the one who provided the funds for the escrow), the Debtor retained legal title to the funds. As the grantee (the one to whom the funds would ultimately be paid), the Debtor had an equitable interest in the funds.

The Court concludes that this is not dispositive of the issue, however. *See, e.g., Creative Data Forms, Inc. v. Pa. Minority Bus. Dev. Auth.*, 72 B.R. 619, 620 (E.D.Pa. 1985) (concluding that escrow was not property of the estate although debtor was both grantor and grantee). The issue is whether the Debtor has a present right to the funds in Escrow. In this case, the Debtor was only a contingent grantee; that is, the Debtor was only entitled to the funds in the Escrow when it fulfilled the condition of constructing the water and sewer facilities.

The Department notes further that it is not correct that the Debtor holds both legal title and all equitable interest in the Escrow. Rather, it contends that the Court needs to examine the Escrow Agreement to determine exactly what rights the Debtor has to those funds. When it does so, the Department argues that the Court must conclude that the estate is not entitled to turnover of the Escrow. It cautions that the Debtor's estate acquired no greater interest in the Escrow than the Debtor had prior to the

bankruptcy filing. *Drexel Burnham*, 138 B.R. at 710 ("Section 541 'is not intended to expand the debtor's rights against others more than they exist at the commencement of the case'." (citations omitted)).

The Department argues that where an escrow is established as an assurance or guarantee fund, like the one in this case, courts have consistently found that the escrowed funds are not property of the estate. *See, e.g., Creative Data*, 72 B.R. at 623–24 (affirming decision of bankruptcy court that escrow was not property of the estate); *In re Simon*, 167 F.Supp. 214, 215 (E.D.N.Y.1958) (holding that escrow for payment of taxes and insurance was not property of the estate); *Cedar Rapids Meats, Inc. v. Hager (In re Cedar Rapids Meats, Inc.)*, 121 B.R. 562, 567 (Bankr. N.D.Iowa 1990) (noting that while courts are divided on whether escrow funds are property of the estate, under Iowa law where escrow fund is to act as security or assurance of performance it is not property of the estate); *Dynasty Express Corp. v. Kurtzman (In re AGSY, Inc.)*, 120 B.R. 313, 319 (Bankr.S.D.N.Y.1990) (holding that escrow was not property of the estate of debtor/grantee); *In re Palm Beach Heights Dev. & Sales Corp.*, 52 B.R. 181, 183 (Bankr.S.D.Fla.1985).

The Department asserts that the *Palm Beach* case is particularly apposite. In that case the debtor, which was engaged in retail land installment sales, had been required to establish a $12.6 million escrow account by the Florida Division of Land Sales to assure that the debtor completed certain drainage and road improvement work promised to the land purchasers. The *Palm Beach* Court concluded that the escrow fund was not property of the estate:

> Said fund is a trust or escrow to assure the completion of the road and drainage improvements on the property and only

upon completion of the improvements, would debtor have any interest in the fund. Any claim, contingency or chose in action against the trust fund is the property of the estate but the fund itself is not. The debtor may not have any part of said fund until such time as the debtor establishes that all prior claims in the fund have been paid and that a residuum remains to which it is entitled. 52 B.R. at 183.

The Court agrees with the Department and the majority of courts who conclude that an escrow into which a debtor puts its property (or from which the debtor is entitled to payments after satisfying a condition) is not property of the estate. Section 541(d) supports this conclusion. It provides:

> Property in which the debtor holds, as of the commencement of the case, only legal title and not an equitable interest ... becomes property of the estate ... only to the extent of the debtor's legal title to such property, but not to the extent of any equitable interest in such property that the debtor does not hold.

11 U.S.C. § 541(d). While it is true that the Debtor in this case has some equitable interest in the Escrow, it does not hold all equitable interests. Rather the lot purchasers too have an equitable interest in the Escrow, which was established to assure that they receive lots with water and sewer facilities. The filing of the bankruptcy case by the Debtor was not sufficient to divest the lot purchasers of their interest in the Escrow. Therefore, section 541(d) compels the conclusion that the property acquired by the estate is no greater than what the Debtor had, namely the right to receive the Escrow funds when the water and sewer facilities have been completed. *See, e.g., Drexel Burnham*, 138 B.R. at 710; *Creative Data*, 72 B.R. at 623. Therefore, the Court con-

cludes that the Escrow is not property of the estate, even though the contingent interest that the Debtor has in the Escrow is property of the estate. *See, e.g., TTS,* 158 B.R. at 587; *O.P.M. Leasing,* 46 B.R. at 667.

### C. *Collateral Attack on Confirmation Order*

■ The Trustee further contends that it is not in breach of any obligation with respect to the construction of utilities because it was relieved of those duties as part of the Plan confirmed in the Florida bankruptcy case. (*See* Exh. T–14 at ¶ 20(a); Amendment to Homesite Purchase Agreement at ¶ 4.) The Lenders agree that as a result of the Florida bankruptcy case, the Debtor altered the rights of the lot purchasers and was released from any obligation to perform under the Escrow Agreement.

During the Florida bankruptcy case, the Debtor initially established a Homesite Program whereby lot purchasers whose lots did not have utilities could switch to developed lots with utilities. This program was approved by the Bankruptcy Court on October 26, 1990. Further, in the Debtor's Plan, lot purchasers were again given the opportunity to exchange their lots for lots in communities where utility services were available and a trust was created with at least 400 improved lots for that purpose. (*See* Exh. T–13 at pp 8, 72.) The Plan also provided that the Debtor and its utility subsidiary would transfer certain condemnation proceeds to fund future utility obligations to lot purchasers. (*Id.* at 72.) If utilities were not provided from that fund, any lot purchaser could elect to switch to an improved lot. Additionally, any lot purchaser had the option to be treated as a general unsecured creditor. As a result of these provisions, the Lenders contend that the Debtor's obligation to provide utility services to

lot purchasers was discharged and the Escrow (like all other property of the Debtor) was re-vested in the Debtor free and clear of any claims that the lot purchasers might have to it. 11 U.S.C. § 1141(b) & (c). Consequently, the Lenders argue that the Department's objection to the Trustee's present motion is an impermissible collateral attack on the confirmation order entered by the Florida Bankruptcy Court.

The Department disagrees with the arguments of the Trustee and Lenders and, specifically with their characterization of the parties' duties under the Escrow Agreement. The Department notes that the language of the Escrow Agreement did not create any obligation to construct utilities or even any debt on the part of the Debtor which could be discharged in bankruptcy. Rather, the Escrow Agreement created a fund to protect the lot purchasers in the event that the Debtor failed to construct the utilities. That Agreement gave the Debtor only a contingent interest in the escrowed funds: the condition to the Debtor's entitlement to the funds was the delivery of a certificate evidencing that water and sewer facilities were available to the lot purchasers. (Exh. T–7 at ¶ 3.) Therefore, the Department argues that the confirmation order entered by the Florida Bankruptcy Court did not "discharge" any debt or obligation of the Debtor with respect to the Escrow. This is confirmed, the Department notes, by the fact that after the Florida bankruptcy case was closed, the Debtor consistently acted in accordance with the Department's interpretation. For example, the Debtor sought the Department's authority to amend the Escrow Agreement to permit the transfer of funds from the Escrow to various governmental units in order to permit those entities to construct the required utilities. These include transfers to Hendry County and the City of Port St.

Lucie in 1994 and to Charlotte County in 1998.

The Court agrees with the Department on this point. Because the Escrow was not property of the estate (see Part B above), the confirmation of the Debtor's Plan in the prior bankruptcy case did not re-vest the Escrow in the Debtor. Further, the Confirmation Order entered in the Debtor's prior bankruptcy case did not have any effect on the rights of the parties under the Escrow Agreement. Specifically, it did not discharge the condition contained in the Escrow Agreement or give the Debtor unfettered access to the escrowed funds. There is nothing in the Plan or the Confirmation Order that purported to do so. (Exhs. T-13 & T-14.) Instead, the Disclosure Statement filed in that case stated that lot purchasers who continued to pay pursuant to their installment contracts but whose contracts were rejected or terminated by the Debtor would be entitled to a refund of their escrow funds, "subject to amending the escrow agreements to permit the release of funds from escrow." (*See* Exh. T-13 at p. 47.) Specifically, the Debtor's Plan did not provide that the Escrow would be released to the Debtor.

Thus, the Court concludes that the lot purchasers were not bound by the terms of that Plan to permit the release of the Escrow to the Debtor's estate. Rather the rights of the parties to the Escrow was not affected by the confirmation of that Plan (except with respect to the release of some funds as part of the transfer of property to the municipalities as specified in the Plan).

### D. *Impossibility of Performance*

■ The Trustee further argues that the Debtor has been relieved of its obligations under the Escrow Agreement by virtue of the fact that the properties owned by the Debtor on which the water and sewer systems were to have been constructed have now all been condemned or transferred to the municipalities. Therefore, the Trustee argues that the Debtor's performance under the Escrow Agreement is impossible and the Escrow Agreement has been terminated as a matter of law. *See, e.g., A & S Trans. Co. v. County of Nassau*, 154 A.D.2d 456, 546 N.Y.S.2d 109, 111 (N.Y.App.Div.1989) ("[T]he law of impossibility provides that performance of a contract will be excused if such performance is rendered impossible by intervening governmental activities"); *Moyer v. City of Little Falls*, 134 Misc.2d 299, 510 N.Y.S.2d 813 (N.Y.Sup.Ct.1986) (granting summary judgment in favor of plaintiff where government action rendered plaintiff's performance of a contract with defendant economically unfeasible); *Metpath, Inc. v. Birmingham Fire Ins. Co. of Pa.*, 86 A.D.2d 407, 449 N.Y.S.2d 986, 989 (N.Y.App.Div.1982) ("There is ample authority holding that where performance becomes impossible because of action taken by government, performance is excused.").

The Department argues that the impossibility of performance doctrine is not applicable in this case. It argues that the doctrine (also known as the frustration of purpose doctrine) is recognized as a defense to a breach of contract action; not as the basis for affirmative relief.

■ The doctrine of frustration of purpose is explained as follows:

> Where after a contract is made, a party's principal purpose is substantially frustrated without his fault by the occurrence of an event the non-occurrence of which was a basic assumption on which the contract was made, his remaining duties to render performance are discharged, unless the language or the circumstances indicate the contrary.

Restatement (Second) of Contracts § 265 (1981). Thus three factors are necessary to invoke the doctrine: (1) the purpose that is frustrated must be the principal purpose of the contract; (2) the frustration of that purpose must not be the fault of the party seeking to be excused from performance; and (3) the occurrence of the event must not have been foreseen at the time of the contract's formation. (*Id.*)

The Department argues that the purpose of the Escrow Agreement was not to build the utilities but instead was to protect the New York lot purchasers if the utilities were not built. Therefore, it asserts that the condemnation by the municipalities did not frustrate the purpose of the Escrow Agreement. Further, the Department contends that the Debtor cannot say that it was not at fault for frustrating the purpose of the Escrow Agreement as it was the Debtor itself which was largely to blame for the failure to build the water and sewer systems. Finally, the Escrow Agreement clearly contemplated that the Debtor might not construct the utilities; in fact the purpose of the Escrow Agreement was to protect the lot purchasers in that very circumstance. Therefore, the Department argues that the Debtors may not invoke the doctrine of frustration of purpose to excuse their failure to perform the Escrow Agreement.

■ The Court agrees with the Department. The purpose of the Escrow Agreement was to protect the lot purchasers in just this eventuality, where the Debtor failed to construct the utilities as promised. The law of impossibility is only applicable where the government action was unforeseeable. *A & S,* 154 A.D.2d at 459, 546 N.Y.S.2d 109. In this case, the possibility that the Debtor would not perform (either through government action or otherwise) was foreseeable, and, therefore,

the purpose of the Escrow Agreement has not been frustrated.

■ Further, even if the purpose of the Escrow Agreement was to have the utilities constructed, the Court concludes that it is through the Debtor's own fault that they were not constructed over the many years since the lots were sold to the New York residents. In fact, the Debtor's failure to perform was not only contemplated at the time the Escrow Agreement was executed, it was the reason that the funds were escrowed. That the municipalities finally condemned the property or otherwise took steps to take over the water and sewer systems may mean that the Debtor cannot construct the utilities today but it does not mean that the Debtor cannot protect the New York lot purchasers as the Escrow Agreement envisioned: by making funds available to them for that purpose. It would be inequitable for the Debtor to fail to perform its obligation to construct utilities and yet receive the money that was set aside to assure that the Debtor did perform.

■ Additionally, under New York law the doctrine of frustration of purpose can only be used as a defense, it cannot be used as a sword as the Trustee is seeking in this case. The Trustee is not using it as a defense to an action by a lot purchaser who is seeking to force performance by the Debtor's estate of its obligation to build a water or sewer facility. Rather, the Trustee is seeking to use the doctrine offensively to recover funds which were to be used to construct those facilities even though the Debtor never performed. This is not permissible. *See, e.g., Sokoloff v. National City Bank,* 208 A.D. 627, 204 N.Y.S. 69, 71 (N.Y.App.Div.1924). As the *Sokoloff* Court stated:

> This defense, however, only goes so far as to excuse the performance of an executory contract. It has never been held

available for the purpose of unjustly enriching one party at the expense of the other. The utmost that the defendant can urge is that it be relieved from the performance of its agreement in so far as the agreement has been rendered impossible of performance, but on no principle can it be urged that the defendant became relieved from the obligation of repayment of the amount received when through no fault on the part of the plaintiff it was unable to complete the contract. If the defense were pleaded as an excuse to an action for damages for failure further to perform the contract, a different question would arise, but here the defendant is seeking to excuse itself not from further performance of the contract, but from payment of a debt owing the plaintiff arising from *the receipt of money from the plaintiff for a specific purpose which the defendant is unable to carry out, and hence there arises an obligation to repay the plaintiff.*

*Id.* at 71 (citation omitted).

In this case, the Debtor did not build the utilities as required. Because of the condemnation proceedings and transfer of the properties to the municipalities, the Debtor cannot now perform that obligation. Nonetheless, the Debtor (and its estate) are not entitled to retain the funds paid to them for performance that is now impossible.

E. *Debtor's Entitlement under Escrow Agreement*

■ The Trustee argues, nonetheless, that there is no longer any purpose to be served by the Escrow and that, consequently, it should be terminated. The Trustee contends that because it was the grantor of the funds and is the only one entitled to receive distributions of the funds, the Escrow should be disbursed to the estate.

The Department disagrees. It asserts that there is no provision in the Escrow Agreement for its termination. The Department argues that, because the Debtor is now unable to provide water and sewer facilities to the lot purchasers, the Department is entitled to direct where the Escrow funds should go.[6] The Department asserts that the funds must be released to it for distribution to the lot purchasers (or to be escheated to the state if they cannot be found). The Trustee responds that the purpose of the Escrow was not to provide a windfall to the State.

The Court agrees with the Trustee to some extent. The Debtor is not in default of the Escrow Agreement because the contracts for sale of the lots expressly provided that any delay in construction of the water and sewer facilities caused by government action would not result in a default by the Debtor. (See Trustee's Motion, Exh. C at ¶ 9.) As the Court found at the hearing, the Escrow Agreement does not require that the Debtor build the water and sewer facilities. Rather it states that to receive the funds in the Escrow, the Debtor must simply provide a certification of a licensed engineer that such facilities have been built. (Exh. T–7 at ¶ s 2, 3.) Therefore, if facilities are built by the local governments who have condemned the Debtor's property that was reserved for those facilities, the Debtor's estate

6. Paragraph 8 of the Escrow Agreement provides:

[I]f there be a default in completion of the above mentioned improvements, to the extent that will not entitle [THE DEBTOR] to withdraw such funds, [THE ESCROW AGENT] shall hold and pay said funds, pursuant to instructions to be given to [THE ESCROW AGENT] by the DEPARTMENT. (Exh. T–7 at ¶ 8.)

would be entitled to a distribution from the Escrow.

The Department argues, nonetheless, that where facilities are built by the municipalities rather than the Debtor, the lot purchasers might have been required to pay additional fees. There is, however, no evidence of that.

Consequently, the Court concludes that the Trustee would be entitled to the release of any additional funds from the Escrow to the extent he is able to present a certification from a licensed engineer that water and/or sewer facilities are available for any lot purchaser whose funds remain in the Escrow. In the absence of such a certification, however, there is no mechanism in the Escrow Agreement for the release of the funds to the Trustee.

## IV. CONCLUSION

For the foregoing reasons, the Court will grant in part the Trustee's motion for release of the Escrow funds.

An appropriate order is attached.

### ORDER

AND NOW this **22nd** day of **MAY, 2007,** upon consideration of the motion of the chapter 7 Trustee to approve the termination of an escrow account established for the protection of New York consumers and the turnover of the remaining escrow funds to the estate, the objection of the New York State Department of State thereto, it is hereby

**ORDERED** that the Motion of the Trustee is hereby **GRANTED IN PART;** and it is further

**ORDERED** that $2,495,470 of the Escrow shall be forthwith released to the Trustee, representing $2,235,397 in funds which are not related to New York lot purchasers and $260,073 in funds which are funds of the Debtor; and it is further

**ORDERED** that $292,140 of the Escrow shall be distributed to the lot purchasers identified in Exhibit T–6 which is attached hereto; and it is further

**ORDERED** that $3,499,161.83 of the Escrow shall be distributed to the Trustee as it represents funds to which the original lot purchasers no longer have any interest; and it is further

**ORDERED** that the Trustee shall be entitled to the release of the remainder of the funds from the Escrow ($2,393,525.17) only to the extent he can present a certification of a licensed engineer from the State of Florida confirming that water and/or sewer facilities are available to a lot covered by the Escrow; and it is further

**ORDERED** that the Escrow Agent shall distribute any interest earned on the escrow funds pro rata in accordance with the entitlements set forth above.

cc: John D. McLaughlin, Jr., Esquire [1]

Exhibit T–6

---

1. Counsel shall serve a copy of this Opinion and Order on all interested parties, including those on the attached list, and file a Certificate of Service to that effect.

Final 348 Qualified - NY Escrow
March 1, 2006

| CONTRACT | NAME | ADDRESS1 | ADDRESS2 | ADDRESS3 | ADDRESS4 | DEVELOPMENT | PLAT | BLOCK | LOT | Contract - EOY 2004 | ACC Bal - EOY 2004 | Date Received Cash |
|---|---|---|---|---|---|---|---|---|---|---|---|---|

Final 348 Qualified - NY Escrow
March 1, 2008

| CONTRACT | NAME | ADDRESS1 | ADDRESS2 | ADDRESS3 | ADDRESS4 | DEVELOPMENT | PLAT | BLOCK | LOT | Cost bal - BOY 2004 | ADC Bal - EOY 2004 | Est Received Code |
|---|---|---|---|---|---|---|---|---|---|---|---|---|

Final 348 Qualified - NY Escrow
March 1, 2006

Final 345 Qualified - NY Escrow
March 1, 2006

Final 346 Qualified - NY Escrow
March 1, 2006